AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
JOHN P. HEHMAN
CLERK

2014 JUL -8 PM 4:44

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WESTERN DIV. AT DAYTON

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Cellular telephone assigned call no.: (937) 416-7953

Case No. 3:14mj272

MICHAEL J. NEWMAN

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A. This court has authority to issue this warrant under 18 U.S.C. sections 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

located in the ____unknown____ District of ____unknown____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. section 666; 18 U.S.C. section 1061 | |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.
☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Lance R. Kepple, FBI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __7-8-14__

City and state: Dayton, Ohio

*Judge's signature*

Michael J. Newman, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR SOUTHER DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER (937) 416-7953 | Case No. **3 : 14 mj 272**<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Lance R Kepple, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(937) 416-7953** (the "**Target Cell Phone**"), whose service provider is Cellco Partnership DBA Verizon, a wireless telephone service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey. The **Target Cell Phone** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), United States Department of Justice, Cincinnati Division. I have been employed as a Special Agent with the FBI since September 1999. I have received training in violent crime investigations, bank robbery investigations, organized crime and gang investigations, drug trafficking investigations, and have participated in numerous organized crime, violent crime, gang, and narcotic related investigations, arrests, and convictions. I have participated in numerous investigations that involved wireless telephone related search warrants and court orders.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1031 and 18 U.S.C. § 666 have been committed, are being committed, and will be committed by Willis Blackshear and others (both known and unknown to law enforcement). There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations.

## PROBABLE CAUSE

5. The United States government, including FBI SA Lance R Kepple, and other law enforcement agencies, including the Ohio Organize Crime Investigators Commission ("OOCIC"), is investigating the public corruption and fraud against the government activities of STEVE RAUCH ("RAUCH"). RAUCH is the owner of the demolition company STEVE RAUCH INCORPORATED ("SRI"), which does a large volume of contracts with the City of Dayton. The following information has been provided to the undersigned by SA Burkart. In April 2013, a former SRI Project Manager (hereafter referred to as Confidential Human Source One "CHS-1") was interviewed. CHS-1 stated that former Dayton Mayor RHINE MCLIN ("MCLIN") and RAUCH had a "tight" relationship and CHS-1 often heard jokes about them being "together." CHS-1 saw pictures of RAUCH and MCLIN together in RAUCH'S office as well as gifts from MCLIN. RAUCH often threatened to "call the Mayor" when he faced issues on Dayton projects. CHS-1 also heard RAUCH state, "I'm going to call the Mayor" on multiple occasions when RAUCH thought SRI wasn't the lowest bidder and therefore unlikely to get a

demolition contract. CHS-1 recalled a City of Dayton federally funded demolition contract in excess of $1 million issued to one of SRI's competitors. RAUCH told CHS-1 the competitor had the lowest bid, but failed to meet the city of Dayton's minority subcontractor requirement. The City of Dayton subsequently reassigned the contract to SRI, which CHS-1 suspected occurred because of RAUCH'S relationship with MCLIN rather than the minority subcontractor requirement.

6. In July 2013, a former project estimator and manager (hereinafter referred to a Confidential Human Source Two "CHS-2") of a now defunct demolition company that directly competed with SRI was interviewed. CHS-2 stated that he began bidding on federally funded demolition projects from the City of Dayton in approximately 2009. At the time, SRI did the majority of demolition work for Dayton and it was "very hard to compete" with them in the bidding process. CHS-2 heard then Dayton Mayor RHINE MCCLIN was RAUCH'S girlfriend at the time. CHS-2 suspected MCCLIN used her influence to ensure RAUCH obtained federally funded demolition contracts because SRI won virtually all bids.

7. In August 2013, a second former SRI Project Manager (hereafter referred to as Confidential Human Source Three "CHS-3") recorded a meeting with SRI's current controller (who is currently cooperating and hereinafter referred to as Confidential Human Source Four "CHS-4"). During their conversation, CHS-4 stated RAUCH gave MCLIN a "shit ton" of money while she was the Mayor of Dayton. CHS-4 continued that MCLIN used an individual (later identified by CHS-4 as former City of Dayton Aide DAVID CLEAVENGER) to pick up the money at SRI's headquarters once every few weeks, "so she [MCLIN] didn't have to ever touch it." While MCLIN was mayor, CHS-4 estimated that RAUCH gave her $100,000 a

3

year. CHS-4 recalled specific occasions when RAUCH would order him to leave money out for MCLIN as follows: "Steve would say, and you know, we need to get $10,000 in cash. So we would get the money, put it in the envelope, seal the envelope, and put it on the front counter. Steve . . . front counter? You know this was at like 5:30 at night. You sure? And he goes, when the door makes the noise. . . or . . . you know, you hear the bell...we used to have a bell on the front door, and he goes, when you . . . when you hear the bell, he goes, let it go."[1]

8.  In September 2013, CHS-3 placed an outgoing recorded telephone call to CHS-4. During a pertinent portion of the conversation, CHS-3 asked CHS-4 the name of the individual who used to come to SRI and get money for MCLIN. CHS-4 reported that there were two individuals, and identified one of them as BLACKSHEAR[2] (the current Montgomery County Recorder). CHS-4 continued that MCLIN used BLACKSHEAR to pick up her money because he was not directly related to her office and, "she couldn't come in herself." CHS-4 stated that BLACKSHEAR still comes into SRI's headquarters and "Steve still pays his campaign and gives him a little money."

9.  On September 21, 2013, the OOCIC Task Force conducted surveillance at the Town and County Shopping Center, Kettering, Ohio. The surveillance was based on CHS-3 information that RAUCH was hosting an annual party and attending guests would park at the

---

[1] The voice identifications on the recorded interceptions are based upon agent review and analysis and are preliminary. Words that appear in quotations are the best transcription of what can be heard at this time during the communication. When words do not appear in quotations, they reflect a summary or interpretation of the words that can be heard in the recordings.

[2] In February 2014, CHS-4 was approached by OOCIC Agents and agreed to cooperate with Law Enforcement. During a subsequent interview, CHS-4 clarified that he/she only witnessed DAVID CLEAVENGER collect money from RAUCH on behalf of MCLIN. CHS-4 further clarified that he/she only witnessed WILLIS BLACKSHEAR collect money on behalf of WHALEY.

4

Town and County Shopping Center before being bused to his residence. For approximately two hours, agents photographed vehicles and individuals who arrived and were believed to be attending the party. Upon reviewing the photographs, agents observed an orange 2-door 2005 Chevrolet Cobalt (according to open source databases, Chevrolet replaced the Cavalier with the Cobalt in 2005), bearing Ohio License Plate FSY-8551 parked in the lot (hereinafter referred to as the "SUBJECT VEHCLE"). According to the Ohio Law Enforcement Gateway (OHLEG) database, Ohio License Plate FSY-8551 is currently registered to an orange 2005 Chevrolet Cobalt, in the name of Willis E. Blackshear Sr., 736 Argonne Drive, Dayton, Ohio (an address located in the Southern District of Ohio).

10. In October 2013, CHS-3 placed an outgoing recorded telephone call to CHS-4. During a pertinent portion of the conversation, the CHS stated he/she was driving and observed BLACKSHEAR driving an "orange Cavalier." CHS-4 responded, "Yeah, yeah that's what he drives dude." CHS-3 then asked CHS-4 if that is what BLACKSHEAR drives to get his "little pay-offs." CHS-4 responded, " Uh-ha . . . that's what he drives up here. Yeah, you're exactly right." Later in the conversation, CHS-4 stated, "What he [BLACKSHEAR] does is he acts as the intermediary, so NAN (a then-current City of Dayton Commissioner and then-mayoral Candidate, now presently City of Dayton Mayor, NAN WHALEY) doesn't have to come out here. You know, the City of Dayton Commission doesn't have to come out here. So he [BLACKSHEAR] does all the running. He [BLACKSHEAR] comes out here and collects all the money." Later CHS-3 asked if "even NAN WHALEY is in on that deal?" CHS-4 responded, "Oh yeah. Very much so." Later CHS-4 continued, "He [BLACKSHEAR] comes in here in his little orange Cavalier and he [BLACKSHEAR] takes the money to go to her [NAN WHALEY]."

5

11.	On October 22, 2013, United States Magistrate Judge Michael R. Merz, signed a warrant (3:13-mj-463, filed under seal) authorizing the Affiant, together with other FBI special agents, the OOCIC Task Force, and other governmental and contract personnel acting on the supervision of such law enforcement officers, to install and monitor a GPS tracking device on the SUBJECT VEHICLE.

12.	On November 1, 2013, OOCIC Task Force members were electronically notified that the SUBJECT VEHICLE was arriving at SRI Headquarters, located at 1550 Soldiers Home West Carrolton, Dayton, Ohio. At approximately 12:19 p.m., OOCIC Task Force members arrived at the location and observed the SUBJECT VEHICLE parked in the SRI Headquarters parking lot. At approximately 3:00 p.m., surveillance observed BLACKSHEAR exit SRI Headquarters and enter the SUBJECT VEHICLE. Moments later, the SUBJECT VEHICLE departed the SRI Headquarters parking lot and was followed to BLACKSHEAR's residence located at 736 Argonne Drive, Dayton, Ohio. Minutes later, the SUBJECT VEHICLE departed and was followed to the Donut Palace, located at 3950 Salem Avenue, Dayton, Ohio. At the Donut Palace, surveillance observed BLACKSHEAR meeting in the parking lot with an individual later determined to be MARLON C. SHACKELFORD. After meeting for several minutes, BLACKSHEAR returned to the SUBJECT VEHICLE and departed the Donut Palace parking lot.

13.	On that same day, the SUBJECT VEHICLE was then observed parking on Ludlow Street, near the intersection of Ludlow Street and West 3rd Street, Dayton, Ohio. At approximately 3:51 p.m., BLACKSHEAR was observed walking into the front entrance of the City of Dayton's City Hall Building. Approximately five minutes later, BLACKSHEAR was

observed exiting the same entrance and returned to the SUBJECT VEHICLE. BLACKSHEAR unlocked the driver's door and leaned into the SUBJECT VEHICLE in a manner that indicated he was retrieving something. BLACKSHEAR then backed out of the vehicle and was photographed holding an unknown white object. After reviewing several photographs, OOCIC Task Force members determined that the white object appears to be folded once into an approximately 4x4 square. BLACKSHEAR then carried the above described white object in his left hand and entered the Montgomery County Courts Building, located at 41 North Perry Street, Dayton, Ohio. Approximately five minutes later, BLACKSHEAR was observed exiting the building from the same location and no longer carrying the above described white object. BLACKSHEAR then walked back to the SUBJECT VEHICLE and departed. At approximately 4:16 p.m., the SUBJECT VEHICLE was observed pulling into the Montgomery County Administration Building parking garage, located at 451 West 3rd Street, Dayton, Ohio. The parking garage had previously been determined to be BLACKSHEAR's employment parking and therefore the surveillance was terminated.

14. In November, 2013, FBI Forensic Accountant ("FA") Susan Sigler conducted open source database checks on MARLON C. SHACKELFORD. During the search, FA Sigler discovered that SHACKELFORD had an unrestricted Facebook page. FA Sigler reviewed SHACKELFORD's unrestricted Facebook page and discovered promotions and photographs from the political campaigns of various individuals, including the City of Dayton Mayor NAN WHALEY. In addition, FA Sigler discovered a post from Mayor WHALEY's unrestricted Facebook page thanking SHACKELFORD for his support.

7

15. In November 2013, pursuant to a Federal Grand Jury Subpoena, the FBI received subscriber and call detail records for a cellular phone number believed to be used by BLACKSHEAR identified as (937) 416-7953.

16. In March 2014, CHS-4 was interviewed. CHS-4 stated that in August 2009 he/she left SRI and returned in June 2012. When the CHS-4 returned, Montgomery County Recorder WILLIS BLACKSHEAR was "regularly" visiting SRI. In approximately June or July 2013, the CHS-4 attended a meeting in RAUCH's office between RAUCH and BLACKSHEAR. During the meeting, RAUCH handed the CHS-4 a white envelope and asked CHS-4 to, "Give this to WILLIS (BLACKSHEAR)". The CHS-4 believes the envelope contained a stack of cash based on the weight; the size of the object in the envelope was consistent with cash; and his/her previous experience in handling envelopes containing cash. In approximately October 2013 and just before the City of Dayton Mayoral election, the CHS-4 met with RAUCH and BLACKSHEAR in the front entrance area of SRI. During the meeting, RAUCH again handed the CHS-4 a white envelope and asked the CHS-4 to give it to BLACKSHEAR. CHS-4 believes the envelope contained a stack of cash based on the weight; the size of the object in the envelope was consistent with cash; and his/her previous experience in handling envelopes containing cash.[3] CHS-4 also believes the envelopes contained cash based on RAUCH's previous statements. Specifically, RAUCH told CHS-4 he gave current City of Dayton Mayor NAN WHALEY $50,000 in cash, and has ways to get the cash to WHALEY that is not detectable. On another occasion, RAUCH told CHS-4 he is using BLACKSHEAR as a "go between" to WHALEY. On two occasions, RAUCH was having an issue on a project and reported to CHS-4

---

[3] See paragraph 12 for details regarding the November 1, 2013 surveillance of BLACKSHEAR.

8

that he (RAUCH) gave WHALEY money and she needs to take care of it. CHS-4 has never heard RAUCH state that any of the cash provided to WHALEY was a campaign contribution or a loan.

17. In March 2014, CHS-4 was again interviewed. CHS-4 stated that on Friday, March 21, 2014, at approximately 2:15 p.m., BLACKSHEAR arrived at SRI to attend a meeting that occurred in CHS-4's office. The purpose of the meeting between CHS-4, BLACKSHEAR, and STEVE RAUCH, was to discuss a variety of topics including recently issued City of Dayton Termination and Cure Letters. At the conclusion of the meeting, CHS-4 and RAUCH walked with BLACKSHEAR to the front entrance of the business. At the front entrance, BLACKSHEAR asked to speak with RAUCH alone and the two walked outside. CHS-4 observed BLACKSHEAR and RAUCH having a discussion through the front glass door of the business. At approximately 3:17 p.m., CHS-4 witnessed RAUCH reach into his front pocket and grab a roll of cash that was wrapped with a rubber band. RAUCH then removed an unknown amount of cash from the roll and handed the cash to BLACKSHEAR. BLACKSHEAR took the cash and placed it his front right pocket. Minutes later, CHS-4 observed the meeting conclude and BLACKSHEAR departed the SRI.

18. In March 2014, CHS-4 identified **(937) 416-7953** as BLACKSHEAR'S cellular phone number. In April 2014, pursuant to a Federal Grand Jury Subpoena, the FBI received additional call detail records for a cellular phone number believed to be used by BLACKSHEAR identified as **(937) 416-7953**. A preliminary review of the requested call detail records indicated that **(937) 416-7953** (*i.e.*, the **Target Cell Phone**) had approximately 6 contacts with (937) 604-2619 from November 29, 2013 to March 17, 2014. (937) 604-2619 has been

9

identified during the course of this investigation as a cellular telephone subscribed to and used by STEVE RAUCH. A preliminary review of the requested call detail records has also indicated that **(937) 416-7953** had approximately 6 contacts with (937) 545-0304 from December 4, 2013 to February 21, 2014. According to the Experian Credit Agency, (937) 545-0304 was last verified to be associated with NANNETTE WHALEY on May 13, 2013.

19. In approximately July 2014, CHS-4 reported that RAUCH and BLACKSHEAR intend to meet on or about July 9, 2014. The meeting is expected to include a payment from RAUCH to BLACHSHEAR for BLACKSHEAR's involvement in SRI's City of Dayton contracts in furtherance of the above described violations of federal law. It is expected that this meeting will occur in the Southern District of Ohio.

20. The investigation relates to the public corruption and fraud against the government activities of WILLIS BLACKSHEAR and others (both known and unknown to law enforcement). Investigators believe that matters relevant to the offenses under investigation have been and continue to be discussed using Cellco Partnership DBA Verizon cell phone number **(937) 416-7953** (*i.e.*, the **Target Cell Phone**). Cellco Partnership DBA Verizon is an electronic communication service provider doing business in Bedminster, New Jersey. The listed subscriber for this number is WILLIS E. BLACKSHEAR and investigators believe the phone is currently being used by WILLIS BLACKSHEAR, a target of this investigation.

21. In my training and experience, I have learned Cellco Partnership DBA Verizon is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide

10

service, namely: cell-site data, also known as "tower/face information" or cell tower/sector records. Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.

22. Based on my training and experience, I know that Cellco Partnership DBA Verizon can collect cell-site data about the Target Cell Phone.

## AUTHORIZATION REQUEST

23. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

24. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the **Target Cell Phone** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as

11

defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

25. I further request that the Court direct Cellco Partnership DBA Verizon to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Cellco Partnership DBA Verizon. I also request that the Court direct Cellco Partnership DBA Verizon to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Cellco Partnership DBA Verizon's services, including by initiating a signal to determine the location of the Target Cell Phone on Cellco Partnership DBA Verizon's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Cellco Partnership DBA Verizon for reasonable expenses incurred in furnishing such facilities or assistance.

26. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

27. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

_____
Lance R Kepple
Special Agent
FBI


Subscribed and sworn to before me on July 8, 2014

_____
MICHAEL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

1. The cellular telephone assigned call number **(937) 416-7953** (the "**Target Cell Phone**"), whose wireless service provider is Cellco Partnership DBA Verizon, a company headquartered at 180 Washington Valley Road, Bedminster, New Jersey.

2. Information about the location of the Target Cell Phone that is within the possession, custody, or control of Cellco Partnership DBA Verizon.

## ATTACHMENT B

### Particular Things to be Seized

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (*i.e.*, antenna towers covering specific geographic areas) and "sectors" (*i.e.*, faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of **Cellco Partnership DBA Verizon** is required to disclose the Location Information to the government. In addition, **Cellco Partnership DBA Verizon** must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with **Cellco Partnership DBA Verizon**'s services, including by initiating a signal to determine the location of the **Target Cell Phone** on **Cellco Partnership DBA Verizon**'s network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate **Cellco Partnership DBA Verizon** for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).